IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THIRD SPACE PARTNERS, LLC, | ) | CASE NO: 1:26-CV-00568 |
| Plaintiff, | ) | |
| | ) | Judge Dan Aaron Polster |
| v. | ) | |
| | ) | OPINION AND ORDER |
| 668 ATRIUM, LLC, *et al.*, | ) | |
| Defendants | ) | |

Before the Court is Defendant 668 Atrium, LLC, *et. al.*'s Motion to Dismiss, ECF 10 (the "Motion"). The Motion has been fully briefed and is now ripe for ruling. For the reasons discussed herein, the Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

### A.   Factual Background[1]

Plaintiff Third Space Partners, LLC ("Plaintiff" or "Third Space") is an Ohio limited liability company with its principal place of business in Cleveland, Ohio. It is currently owned by Harley Magden ("Magden"), Maureen Klang, and Jeffeary Miskiri ("Miskiri"). ECF 1 at ¶ 1. Defendant 668 Atrium, LLC ("668 Atrium" or "Landlord") is an Ohio limited liability company with its principal place of business in Willoughby, Ohio. *Id.* at ¶ 2. It owns a residential apartment building with two ground-floor bar/restaurant spaces, located at 668 Euclid Avenue in Cleveland, Ohio (the "Property," and the bar/restaurant space located in Suite 2 is hereinafter referred to as the "Premises"). *Id.* Defendant K&D Management, LLC ("K&D") is a business entity with its principal place of business in Ohio. *Id.* at ¶ 3. Defendant The K&D Group, Inc. was a business entity organized under Ohio law that filed its Certificate of Dissolution on September 30, 2021.

---

[1] At the motion to dismiss stage, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012).

ECF 10-1, at 8. K&D managed the Property at all relevant times, by and through its agents, including Vice President of Commercial Real Estate Matthew Driggs ("Driggs"), District Manager Daniel Reed ("Reed"), and Vice President Douglas E. Price IV ("Price IV"). *Id*. Defendant Douglas E. Price III ("Price III") is the CEO of Defendant K&D Management, LLC. *Id*. at ¶ 4.

In June 2020, Plaintiff's predecessor entity, doing business as Society Lounge ("Society Lounge"), rented the Premises from the Landlord in a lease agreement (the "Lease") negotiated through K&D. *Id*. at ¶ 6. The owners of Society Lounge at the time were Harley Magden, Aaron Magden, and Joey Fredrickson ("Fredrickson")—none of whom are Black. *Id*. Magden signed the Lease on behalf of Society Lounge. *Id*. Price III, as Manager of the LLC which was the sole member of the Landlord, signed it on behalf of the Landlord. *Id*. K&D Management is identified as agent for property management and rent remittance. *Id*.

The Premises include an indoor ground-floor space and dining mezzanine. *Id*. at ¶ 7. Section 6(a) of the Lease states that the Premises were to be used to operate "a restaurant and bar, and for such other customary and allied purposes." *Id*. The Lease also provided Plaintiff with exclusive rights to use the attached outdoor patio from April 1 to September 30 of each year. *Id*. Plaintiff paid an additional $1,000 rent per month for that privilege. *Id*. Plaintiff's ability to use the outdoor patio space was a "material" factor in their decision to rent the Premises, because they planned to utilize the space for outdoor musical entertainment, including live music and DJs. *Id*. The Lease also included restroom, lobby, and parking access which was shared with the neighboring residential building and was also owned by the Landlord and managed by K&D. *Id*. at ¶ 8; Lease at Section 8. Section 20 of the lease also states that "at all times[,]" Plaintiff was to "have the peaceable and quiet enjoyment and possession of the [Premises] without hindrance or claim from Landlord or and persons lawfully claiming the [Premises]." *Id*. The Lease was a

69-month term, expiring initially on February 28, 2026. *Id*. at ¶ 9; Lease at Section 2(a). The Lease also provided a renewal option to Plaintiff for an additional five-year term. *Id*.; Lease at Section 2(b). Written notice of Plaintiff's intent to exercise its option was to be provided to the Landlord at least 180 days prior to the expiration of the initial 69-month term. *Id*.

The Landlord and Plaintiff (which was at the time still owned by all-white management) entered two lease amendments: the first substituted Third Space in place of Society Lounge, and the second allowed rent deferments given the economic realities of the restaurant industry during the COVID-19 pandemic. *Id*. at ¶ 10. The original Lease terms continued to apply in tandem with these amendments. *Id*.

In August 2020, Plaintiff opened a nautical-themed American bar/restaurant called Sixth City Sailor's Club ("SCSC") at the Premises. *Id*. at ¶ 11. SCSC utilized the outdoor patio for lawn games and music (live and DJs). *Id*. Most of SCSC's patrons were white, and its live music performers were also mostly white. *Id*. at ¶ 12. During SCSC's operation, Fredrickson and Klang primarily dealt with Reed from K&D to handle Premises-related matters. *Id*. SCSC offered live patio music frequently during warmer months, including late at night. *Id*. at ¶ 13. Reed occasionally contacted Fredrickson regarding the noise or music level, but never demanded that he handle anything immediately, nor did he forward residential tenant complaints. *Id*. Reed also recognized that patio sounds might be amplified and echo in the "alcove-like" setup of the building. *Id*. The previous occupant of the Premises had operated a restaurant there for seven years, which was white-owned and served mostly white clientele. *Id*. at ¶ 14.

In late 2021, SCSC's business was suffering and Third Space decided to close it and pivot to a sit-down restaurant model. *Id*. at ¶ 15. To execute this pivot, Third Space brought on Miskiri— who is Black—as a partner and co-owner of the entity. *Id*. at ¶ 16. Third Space, in conjunction

3

with new partner Miskiri, launched "House of Creole" ("HOC") at the Premises. *Id*. HOC was one of Miskiri's signature restaurant concepts, and served New Orleans-inspired Creole food with European, African, and Native American roots. *Id*. HOC opened in February 2022, and to date has operated as a restaurant with mid-to-high price entrees and high reviews for its food. *Id*. at ¶ 19. HOC offers patio entertainment including DJs and live music. *Id*. On days that HOC does not have live performers, it plays R&B music through speakers. *Id*. Except for special events, HOC does not offer amplified music past 9pm. *Id*.

February 19, 2022, was the second Saturday night HOC was open, and was the day following the NBA All-Star Game hosted in Cleveland that year. *Id*. at ¶ 20. Anticipating large downtown crowds, HOC hired a DJ and security. *Id*. Miskiri and Klang were onsite at HOC that evening, but Klang left early in the evening. *Id*. at ¶ 22. Around 9pm, Klang received a series of text messages from Reed, who was not on site, describing a chaotic scene that was being relayed to him through other K&D employees that individuals (allegedly assumed to be HOC patron) were trespassing in residential hallways and allegedly using pepper spray and vaping. *Id*. at ¶¶ 22, 32. Reed also contacted Miskiri telling him to "get your people out of there immediately." *Id*. at ¶ 24. Miskiri, a Black man, took offense to the racial implications inherent in this statement and accused Reed of being racist. *Id*. Reed also texted Klang (who is white) asking if Klang was "on site" and stating that "you [Klang] going down there [to observe the scene unfolding at HOC] makes me feel a lot better." *Id*. However, when Klang arrived back at HOC that night, he found nothing amiss. *Id*. at ¶ 25. Klang also pulled security camera footage showing that the lobby door to the residential building, which was ordinarily FOB-secured, was unlocked. *Id*. Klang texted Reed a picture of the unlocked door and explained to him that the trespassers were entering that way, and HOC was not responsible for this oversight. *Id*. at ¶¶ 25-26. Reed later sent apologetic messages

to both Miskiri and Klang and claimed that he never intended his comments to have racist insinuations. *Id*. at ¶ 28.

HOC continued to be a successful restaurant concept despite the February 19, 2025, disputes. *Id*. at ¶¶ 31-32. However, K&D continued to attribute building concerns to HOC, including blaming any common area problems and dirty bathrooms to HOC, even when the restaurant was closed. *Id*. at ¶ 33. K&D also forwarded resident complaints about the patio music to HOC. *Id*. at ¶ 34. Plaintiff contends that these incidents are attributable to racial biases against Miskiri, majority-Black patrons at HOC, and patio music genres associated with Black culture. *Id*. at ¶ 35. Plaintiff also contends that this treatment was materially different from Defendants' approach to the SCSC restaurant concept, although SCSC engaged in the same type of conduct. *Id*. at ¶ 36-37. On various occasions, K&D complained about the volume of HOC's patio music and demanded that it turn down the volume. *Id*. at ¶¶ 37-42. Miskiri pointed out to Reed the "double standard" of Defendants' treatment of SCSC (which it recognized had played music at louder volumes than HOC) versus its treatment of HOC. *Id*. Klang even placed decibel meters to ensure that HOC's music remained in compliance, but K&D continued to complain regardless of appropriate decibel levels. *Id*. at ¶ 44-46. Driggs sent an email to Klang informing him that after speaking with "ownership," (which Plaintiff contends is a reference to Defendant Price III), Defendants ordered that Plaintiff cease playing patio music. *Id*. at ¶ 47. Plaintiff contends that this resulted in lost business during that week. *Id*. at ¶ 48. Days later, HOC's counsel emailed Driggs to remind him that patio music was a "Permitted Use" under the Lease. *Id*. at ¶ 49. After this email, Defendants ceased to escalate noise issues to "ownership" and HOC resumed its normal patio music practices. *Id*. at ¶ 51. Plaintiff contends that "Defendants seemed resigned to HOC's presence for the remainder of the Lease and set to bide their time until it expired." *Id*. at ¶ 52.

Plaintiff contends that HOC's tenant needs were "deprioritized," resulting in delayed deliveries, unresponsiveness to pest control requests, and "lax" building security including a failure to halt a theft, alleged to be in plain view of Defendants' hired security company, of over $10,000 of HOC's top-shelf liquor. *Id.* at ¶¶ 55-57. During the Lease term, HOC contracted with a third-party extermination service, Orkin pest control. *Id.* at ¶ 58. Section 5(a)(iv) of the Lease required HOC to provide exterminating services for the Premises at least twice per month. *Id.*; Lease at Section 5(a)(iv). *Id.* But in early 2024, Defendants ordered HOC to cancel its contract with Orkin and informed HOC that it would have to use Defendants' preferred exterminator instead. *Id.* at ¶ 59. Defendants' exterminator was "ineffective" and did not treat the Premises as frequently as Orkin. *Id.* HOC repeatedly requested that it be permitted to bring back the other exterminator or that Defendants' exterminator make more visits due to a persistent problem with flies. *Id.* When Defendants' exterminator did visit the Premises, it informed HOC staff that the issue with excessive flies dated back years and was attributable to a trash chute in a neighboring residential building. *Id.*

In a September 17, 2025 phone call, Magden told Driggs that Third Space wished to exercise its option to extend the Lease. *Id.* at ¶ 63. Via text messages the next day, Driggs told Magden that Third Space had failed to exercise the renewal option within the 180-day window, but that he was "pretty sure" the Landlord would still honor the option if it was exercised "quickly[.]" *Id.* at ¶ 64. Magden asked for advice on "the best way to proceed," to which Driggs responded that he would speak with ownership after the weekend and "figure it out for you." *Id.* On September 25, Magden asked for an update, to which Driggs stated that he needed until after that weekend to speak with owners. *Id.* at ¶ 65. On October 1, after another follow-up, Driggs told Magden that ownership had reservations about renewal, citing pest and cleanliness issues.

*Id*. at ¶ 66. On October 6, Driggs emailed Magden a formal letter from the Landlord stating that the Lease would not be renewed. *Id*. at ¶ 68. On October 20, Plaintiff sent the Landlord a letter through counsel noting its surprise at the non-renewal letter and that a *de minimis* time delay in exercising the renewal option was not grounds for a Lease termination. *Id*. at ¶ 69. Plaintiff also offered to have "further good faith discussions as to renewal terms and address any concerns Defendant[s] might have pertaining to the Lease." *Id.*

On October 24, 2025, Defendants sent a letter through counsel in response to Plaintiff's October 2025 letter stating that they would "vigorously oppose" Plaintiff's efforts to exercise the renewal option because of the time expiration. *Id*. at ¶ 70. Defendants also refused to negotiate new commercially competitive lease terms. *Id*. at ¶ 73. Plaintiff states that Defendants did not have a new tenant lined up at the time, nor did Defendants provide any rationale as to why they would be opposed to further negotiations. *Id*. Plaintiffs also contend that "upon information and belief," Defendants engaged in racial steering practices at this time. *Id*. at ¶ 74. Plaintiff alleges that Defendants aimed to deter nonwhite residential applications and/or reject apartment applications from nonwhite applicants to the adjoined residential apartment building. *Id*. In at least one alleged case, Defendants have cited to "unwritten policies" (which Plaintiff contends are pretextual), requiring proof of a job with a minimum of forty hours per week to accept a lease application, even where income requirements by the applicant were otherwise met. *Id*.

On November 26, 2025, the Landlord filed an action in the Cuyahoga County Court of Common Pleas seeking declaratory judgment that Third Space had failed to properly renew the Lease (the "State Action").[2] *Id*. at ¶ 76. Since that time, Third Space has confirmed to the Landlord

---

[2] *668 Atrium LLC v. Third Space Partners LLC*, Case No. CV-25-128850 (Ohio C.P. Cuyahoga Cnty. filed Nov. 26, 2025). The Court notes that the State Action was filed approximately three-and-a-half months prior to the instant action being filed. Indeed, Plaintiff filed an answer and counterclaim in the State Action almost a month prior, even noting in that pleading that it was "currently in the process of finalizing [the federal] complaint for filing." *Id.*, Answer

that it has a new lease and is leaving the Premises. *Id*. On December 12, 2025, Plaintiff informed Defendants that it would no longer seek to renew the Lease and would vacate the Premises. *Id.* at ¶ 80. Accordingly, because there was no longer a justiciable controversy, Plaintiff stated its expectation that the Landlord dismiss the State Action. *Id.* However, Landlord's counsel told Plaintiff in a January 2, 2026, letter that it would not move to dismiss the State Action. *Id*. at ¶ 81. Plaintiff filed a counterclaim for frivolous litigation conduct in the State Action. *Id*. at ¶ 83. In that counterclaim, Plaintiff noted that it was "contemplating filing a federal action based on race discrimination." *Id.* at ¶ 86.

Plaintiff alleges that it was forced to make a "hasty decision" in choosing a new location and was unable to negotiate favorable lease terms, including that it was forced to buy out a previous tenant's liquor license to secure a new location. *Id*. at ¶ 78. Defendants (through Price III) also told Plaintiff that HOC could have extra time for its move-out, but later reneged on this agreement and informed Plaintiff that someone would be at the Premises to change the locks on March 2, 2026. *Id*. at ¶¶ 84-86. Plaintiff alleges that this was retaliatory conduct based on Plaintiff's counterclaim in anticipation of Plaintiff filing this federal action. *Id*. at ¶¶ 86-88. Even after Plaintiff vacated the Premises and cleaned the space (which included the hiring of a professional clean-up and move-

---

and Countercl., ¶ 7 & n.3 (Feb. 18, 2026). But state courts have concurrent jurisdiction over all of Plaintiff's federal claims in the instant action. *See Testa v. Katt*, 330 U.S. 386, 391 (1947) (recalling that "[i]f an act of Congress gives a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not be enforced, if not provided otherwise by some act of Congress, by a proper action in a state court" (quotation omitted)); *id.* at 394 (noting that if the same type of claim, arising under state law, would be enforced in state courts, then state courts are generally not free to refuse enforcement of the federal claim); *see also* 42 U.S.C. § 3613(a)(1)(A) (stating that "[a]n aggrieved person may commence a civil action [under the Fair Housing Act] in an appropriate United States district court <u>or State court</u>" (emphasis added)).

Accordingly, this action should have been brought as part of Plaintiff's counterclaims in the State Action. This would have been the most prudent and efficient use of judicial resources, instead of requiring two courts to concurrently litigate claims stemming from the same set of operative facts. In this situation, the Court would ordinarily be inclined to *sua sponte* dismiss this matter for these reasons. However, in recognition of the fact that the State Action has since been dismissed by stipulation of the parties (seemingly in favor of litigation these issues in federal court), the Court will allow this matter to proceed.

out crew), Defendant Price III again claimed that the space was not adequately cleaned and had persistent pest issues. *Id*. at ¶¶ 90-92. After vacating, Plaintiff sent one of HOC's employees (who is Black) to stand on the public sidewalk in from of the vacant Premises to hand out flyers to passers-by informing them of the new location. *Id*. at ¶ 93. Defendants took issue with this and ordered Klang to remove him, and then stated that they would call the police immediately if he returned. *Id*.

### B. Procedural Background

On March 9, 2026, Plaintiff filed the instant action alleging five counts of various federal and state claims. *Id.* Plaintiff's first count against all Defendants alleges violations of Title 42 of the United States Code at Sections 1981, 1982, and 1985. *Id*. at ¶¶ 96-105. Plaintiff argues that by refusing to honor the Lease renewal option, otherwise interfering with Plaintiff's rights under the Lease, refusing to negotiate a new lease with Plaintiff, and intentionally discriminating against Plaintiff on the basis of race and/or ethnicity, Defendant has violated Section 1981. *Id*. at ¶ 97. Specifically, Plaintiff claims that Defendants' actions were motivated by discriminatory racial anti-Black animus toward Miskiri and predominately Black HOC clientele, as evidenced by the disparate treatment of the SCSC restaurant concept and HOC restaurant concept, and in Miskiri's joining of the Third Space leadership team. *Id*. Plaintiff contends that Defendants' conduct impaired Plaintiff's right to make and enforce contracts as protected under section 1981. *Id*. at ¶ 98. Plaintiff also contends that Defendants' refusal to negotiate a lease and interference with Plaintiff's occupancy and use rights constitute a violation of section 1982, which guarantees equal rights to all citizens with respect to property rights. *Id*. at ¶ 99. And Plaintiffs allege that Defendants, "by mutual understanding and coordinated actions," engaged in joint conduct with the intent to deprive Plaintiff of equal protection of the laws, amounting to a violation of section

9

1985(3). *Id*. at ¶ 100. Plaintiffs contend that the coordinated conduct included, but was not limited to, refusal to negotiate a lease, imposing disparate treatment of Lease terms, and interfering with Plaintiff's use and enjoyment of the Premises—all of which were actions taken with discriminatory intent. *Id*. at ¶¶ 100-05.

Plaintiff's second cause of action alleges that Defendants violated the federal Fair Housing Act ("FHA")—42 U.S.C. §§ 3601 *et. seq.*—by refusing to renew the Lease or negotiate a new lease with Plaintiff, interfering with Plaintiff's rights under the Lease, and applying "pretextual 'policies'" to residential housing applications. *Id*. at ¶¶ 106-07. Plaintiff alleges that Defendants' rental policies amounted to racial steering, and were undertaken by Defendants in an effort to maintain or restore a mostly-white pool of residential applicants. *Id*. at ¶¶ 109-11. Plaintiff's third cause of action alleges that the Defendants violated Ohio's state Fair Housing Act ("Ohio FHA") for the same aforementioned reasons. *Id*. at ¶¶ 112-115.

Plaintiff's fourth cause of action alleges that Defendants breached a valid and enforceable contract by breaching the Lease agreement. *Id*. at ¶ 116. Specifically, Plaintiff alleges breach of the implied covenant of quiet enjoyment attributable to Defendants' interference with the patio music. *Id*. at ¶¶ 119-121. Plaintiff also alleges that Defendants breached the Lease by ordering Plaintiff to cease using its own exterminator, and instead appointed its preferred exterminator who provided infrequent and ineffective pest control services. *Id*. at ¶¶ 122-24. Plaintiff's fifth cause of action alleges that Defendants tortiously interfered with Plaintiff's business relations by interrupting live patio music, special events, and private events "based upon pretextual noise complaints that were premised upon racial animus." *Id*. at ¶¶ 125-27.

On May 8, 2026, Defendants filed a Motion to Dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6)

(the "Motion"). ECF 10. Defendants briefed eight issues opposing all five counts. *Id*. First, Defendants argue that all claims against K&D Group, Inc. fail as a matter of law because that entity lacks the capacity to be sued. *Id*. at 8. Defendants likewise argue that all claims against Defendant Price III fail as a matter of law because they are based upon impermissible group pleading. *Id*. at 9-10. Next, Defendants argue that Plaintiff failed to state plausible section 1981 and 1982 claims because it did not plausibly plead that Defendants interfered with a contractual right, and because it did not plausibly allege that Defendants' actions were motivated by racial animus. *Id*. at 10-13. Defendants also argue that Plaintiff's section 1985 claim must fail because it did not plausibly plead predicate section 1981 and 1982 claims. *Id*. at 13-15.

Defendants next contend that Plaintiff has failed to state a claim under the federal Fair Housing Act and Ohio Fair Housing Act because the statutes do not apply to "purely commercial transactions[,]" and because Plaintiff does not have standing to sue for racial steering within the statutory meaning of an "aggrieved person[.]". *Id*. at 15-17. Next, Defendants argue that Plaintiff has not plausibly alleged a breach of the covenant of quiet enjoyment because Plaintiff was not actually nor constructively evicted, and that the plain language of the Lease forecloses Plaintiff's breach claim as it is related to the extermination services. *Id*. at 18-19. Defendants also contend that Plaintiff has not plausibly pled tortious interference because it failed to identify the customer relationships with which Defendants allegedly interfered. *Id*. at 19-20.

On June 8, 2026, Plaintiff filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss. ECF 12. Defendants then filed a Reply Memorandum in support of the Motion on June 22, 2026. ECF 13.

11

## II.  STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012). Under the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, to survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The plausibility standard "asks for more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Complaints alleging "naked assertion[s]" devoid of "further factual enhancement" will not survive a motion to dismiss. *Twombly*, 550 U.S. at 557. In addition, simply reciting the elements of a cause of action or legal conclusions will not suffice. *Iqbal*, 556 U.S. at 678.

## III.  ANALYSIS

### A.  Claims Against Defendant K&D Group, Inc.

All of Plaintiff's claims against Defendant The K&D Group, Inc. must fail as a matter of law because that entity lacks the capacity to be sued. Because The K&D Group, Inc. was organized under Ohio law, its capacity to be sued is governed under Ohio law. *See Hollingsworth v. Peterson*, No. 1:25-cv-27, 2026 WL 879226, at *3 (S.D. Ohio Mar. 31, 2026); Fed. R. Civ. P. 17(b). And under Ohio law, a corporation's legal capacity to be sued is predicated on the legal existence of the corporation. Ohio Rev. Code Ann. § 1701.13(A); *see also Grimmer v. Shirilla*, 2016-Ohio-5423, 76 N.E.3d 363 at ¶ 31 (Ct. App.). A corporation legally exists from the time its articles of incorporation are filed until five years after a corporation is "wound up." *Id.*; Ohio Rev. Code Ann.

§§ 1701.04(D), 1701.88(A). And federal courts have held that Ohio law bars cognizable claims against a corporation after the five-year post-dissolution period ends. O.R.C.A. § 1701.88(B); *see also Ohio ex rel. DeWine v. Breen*, 362 F.Supp.3d 420, 441 (S.D. Ohio 2019). Here, because The K&D Group, Inc. filed its Certificate of Dissolution in 2016,[3] it no longer legally exists as a corporation and therefore does not have the capacity to be sued. ECF 10-1 at 8. Plaintiff does not dispute this in its Opposition.

As such, any claims Plaintiff has made against The K&D Group, Inc. are dismissed with prejudice.

### B.  Claims Against Defendant Price III

Plaintiff's claims against Defendant Price III do not assert any facts related to his specific and individual conduct but instead rely on impermissible group pleading. Impermissible group pleading occurs when a plaintiff lumps together the acts of individual defendants without attempting to identify the conduct of any individual actor. *Robertson v. Univ. of Akron Sch. of L.*, No. 5:20-cv-1907, 2021 WL 3709915, at *5 (N.D. Ohio Aug. 20, 2021) (holding that grouped allegations against multiple defendants were "insufficient to demonstrate that each individual defendant was personally involved in the alleged [conduct]"); *see also Mhoon v. Metro Gov't of Nashville & Davidson, Co., Tenn.*, No. 3:16-cv-1751, 2016 WL 6250379, at *3 (M.D. Tenn. Oct. 26, 2016) (granting motion to dismiss where plaintiffs stated generic reference to "Defendants" without specifying which defendant was involved in which conduct).

Here, Plaintiff similarly lumps Price III in with the rest of the defendants by referring not

---

[3] The Court properly takes judicial notice of the Certificate of Dissolution, ECF 10-1, Ex. A, because it is publicly available on the Ohio Secretary of State's website. Federal Rule of Evidence 201 provides that a court may judicially notice a fact that is not subject to reasonable dispute because it is either (1) "generally known" within the court's territorial jurisdiction, or (2) can be accurately and readily determined from a source "whose accuracy cannot be reasonably questioned." Fed R. Evid. 201(b). Courts may properly take notice of public records and government documents (including information available on governmental websites) because their accuracy cannot be reasonably questioned. *See Overall v. Ascension*, 23 F. Supp. 3d 816, 824-25 (E.D. Mich. 2014).

to any of his specific conduct, but instead repeatedly alleging conduct by "Defendants" or stating that Price III engaged in conduct "on information and belief." ECF 1 at ¶¶ 16, 30, 36, 48, 54-55, 58-60, 74-75, 79, 95, 97-105, 107-111, 113-115. Plaintiff also refers to Price III as "ownership" without specifying any actions taken individually by him. *Id*. at ¶¶ 4, 6, 72. Because no individual allegations have been made against Price III at this point, all claims against him fail as a matter of law. These claims are dismissed without prejudice.

## C. Alleged Violations of Federal Civil Rights Laws

Plaintiffs allege violations of three civil rights statutes under one count in the Complaint. ECF 1 at 29. Section 1981 aims to ensure equal protection in contractual relationships; it states that all citizens should have the same rights as white citizens when it comes to "mak[ing] and enforc[ing] contracts[,]" which it defines as "including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1982 provides protections from discrimination in property rights, and provides that "[a]ll citizens … shall have the same right … as is enjoyed by white citizens … to inherit, purchase, lease, sell, hold, and convey real and personal property. 42 U.S.C. § 1982. Section 1985 prohibits individuals from conspiring to deprive any person or class of persons from enjoying equal protection of the laws, or of equal privileges and immunities of the law. 42 U.S.C. § 1985(3). Plaintiff has plausibly pled a claim for relief under sections 1981 and 1982, but fails on its section 1985 claim. Because the analysis of sections 1981 and 1982 are similar for purposes of this case, those arguments are considered together.

### i.     42 U.S.C. §§ 1981-82

A plausible section 1981 claim must allege that the plaintiff possessed "'a contractual right that the defendant blocked or impaired.'" *Watkins v. BLM Companies, LLC*, 644 F.Supp.3d 439,

14

450 (6th Cir. 2022) (quoting *Williams v. Richland Cnty. Children Servs.*, 489 F. App'x 848, 851 (6th Cir. 2012)). The "blocking or impairment" must also be causally connected to the plaintiff's race: the plaintiff must show that: (1) he belonged to a protected class; (2) the defendant <u>intended</u> to discriminate against him <u>on the basis of race</u>; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981. *Inner City Contracting, LLC v. Charter Twp. of Northville, Mich.*, 87 F.4th 743, 754-55 (6th Cir. 2023) (discussing the proper application of the standard in *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006)). Similarly, to state a plausible claim under section 1982, a plaintiff must allege facts suggesting a causal connection to the plaintiff's race, particularly that (1) he is a racial minority; (2) the defendant <u>intended</u> to discriminate against him <u>on the basis of race</u>; and (3) the discrimination concerned one of section 1982's protected activities. *Goodykoontz v. Cuyahoga Cnty.*, No. 1:24-cv-1309, 2024 WL 4519253, at *4 (N.D. Ohio Oct. 17, 2024); *see also Gerber v. Herskovitz*, 14 F.4th 500, 510-11 (6th Cir. 2021).

The second element for both claims, intent, requires the plaintiff to present either direct or circumstantial evidence, the latter of which may be used to raise an inference of intentional race discrimination, "that make plausible their allegations." *Inner City Contracting*, 87 F.4th at 755. Direct evidence of intent to discriminate requires the Court to conclude that unlawful racial discrimination was the "motivating factor" in the defendant's actions. *Sharp v. Aker Plant Servs. Group, Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (quotation omitted). While discriminatory remarks by "decision-makers" in an organization can constitute direct evidence, stray or off-hand remarks that are unrelated to a decision-making process cannot. *Id*.; *see also Duncan v. Bainbridge Motor Apts.*, No. 2:08-cv-180, 2010 WL 11460007, at *9 (S.D. Ohio Sept. 27, 2010); *Geiger v. Tower Auto.*, 579 F.3d 614, 620-21 (6th Cir. 2009). Important to the determination of whether

15

discriminatory remarks are directly intentional or off-handed is whether the remarks were "vague, ambiguous or isolated[,]" and whether they were proximate in time to the alleged discrimination. *Duncan*, 2010 WL 11460007, at \*9; *see also Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994).

Here, Plaintiff has not plausibly alleged facts showing direct evidence of Defendant's intent to discriminate based on race. ECF 13 at 9-11. Plaintiff alleges two remarks as direct evidence of intentional discrimination: (1) Reed telling Klang, a white manager, that him going to the site made him feel better; and (2) Reed telling Miskiri, a Black Third Space partner, to "get your people out of there immediately." ECF 12 at 12. First, it is possible that these remarks can be construed as racially motivated. Certainly the phrase "your people," when uttered to a Black man, could be perceived as implicit-bias-made-explicit against Black patrons and Black people in general. But it is equally possible that they are stray remarks, and are thus better characterized as vague, ambiguous, or isolated. Just as the phrase "your people" could be construed to mean Black people, it could have been Reed referring to the patrons of House of Creole who he in good-faith believed to be trespassing in the residential property—agnostic as to their race. Further, these remarks were uttered by Reed, who is not a 668 Atrium decision-maker.[4] Last, both of these remarks were made on February 19, 2022—at least three years before the alleged discriminatory acts occurred (to wit, refusal by 668 Atrium to renew lease or negotiate new lease of the premises). ECF 12 at 12; ECF 13 at 10. Because these remarks can be considered ambiguous or vague, were not uttered by a decision-maker, and happened years before the alleged discrimination occurred, they are not alone enough to constitute direct evidence of intentional discrimination.

---

[4] Reed is not a decision-maker for purposes of this question because Plaintiff has not alleged that he had any authority over the decisions related to 668 Atrium's non-renewal of the lease and decision not to participate in additional negotiations, which are the basis of Plaintiff's discrimination claims.

But Plaintiff can still meet the plausibility standard if it alleges sufficient circumstantial evidence of the defendant's intent to discriminate. *See Inner City Contracting, LLC*, 87 F.4th at 755. Under section 1981, a plaintiff may allege circumstantial evidence of intentional discrimination in two ways: when the plaintiff sought to make a contract for services ordinarily provided by the defendant, (1) the plaintiff was denied the contractual right while similarly situated persons outside the protected class were not; or (2) the plaintiff was treated in such a hostile manner that a reasonable person would find it objectively discriminatory. *See id.* (citing *Keck v. Graham Hotel Sys, Inc.*, 566 F.3d 634, 639 (6th Cir. 2009)). The former method requires the plaintiff to plausibly assert a comparison between how it was treated by the alleged discriminatory entity versus how the entity treated members of a non-protected class.

Here, Plaintiff does not allege any facts to establish the latter method, objective hostility. Plaintiff instead pleads facts establishing the former theory. Plaintiff employs a before-and-after theory to draw a comparison between how it was treated when Third Space was all-white owned versus when Miskiri, who is Black, joined in ownership. ECF 1 at ¶ 97. The two issues here are (1) whether Plaintiff's self-comparator is sufficient, and if so, (2) whether Defendants treated Plaintiff differently. Defendants are correct that Plaintiff may not use a self-comparator to allege discrimination in terms of Defendants' alleged refusal to allow extension of the lease. This is because Plaintiff plainly violated the extension term of the lease by failing to notify Defendants of its intention to renew within the 180-day contractual window. ECF 13 at 11. But Plaintiff is still permitted to use a self-comparison to establish plausible section 1981 and 1982 claims in reference to Defendants' alleged differential treatment of Plaintiff's patio music when SCSC was operating on the premises versus when HOC was in operation. ECF 12 at 12.

In the commercial lease context, a plaintiff must plausibly assert that it was treated

differently than other property owners who were similarly situated "in all material respects." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462-63 (6th Cir. 2012) (citations omitted). But "materiality cannot be evaluated in a vacuum[,]" and "the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." *Id*. at 463 (quotations omitted). Because of this, "determining whether individuals are similarly situated is usually a factual issue for the jury." *Id*. (quotation omitted) This determination is essential because a material difference between the plaintiff and the entity that it alleges received better treatment would justify the disparate treatment on grounds other than race. See *id*. (quoting *TriHealth, Inc. v. Hamilton Cnty.*, Ohio, 439 F.3d 783, 790 (6th Cir. 2005) ("…[D]isparate treatment of persons is reasonably justified if they are dissimilar in some material respect [other than race].")).

Here, Plaintiff has pled enough circumstantial evidence using its before-and-after theory to raise an inference of intentional discrimination, and thus its section 1981 and 1982 claims survive a Rule 12(b)(6) motion to dismiss. Plaintiff alleges no other material differences other than the addition of a Black business partner to Third Space and the establishment of a restaurant that primarily attracted Black patrons. ECF 1 at ¶¶ 16, 32-36. Plaintiff also plausibly alleges that it was indeed treated differently after Miskiri joined and HOC was established compared to its previous counterpart in all white-owned SCSC with majority-white patrons. *Id*. Neither this Court nor Defendants have identified caselaw that prohibits Plaintiff from using its before-and-after theory as a sufficient comparator to raise an inference of intentional discrimination. ECF 13 at 11-12. Defendants' argument that Plaintiff was not treated differently also fails. Plaintiff plausibly alleges that it engaged in the same conduct while operating HOC as it did when operating SCSC: establishment of a restaurant (¶¶ 14-16), and playing patio music at such restaurants (¶¶ 37, 46, 49, 53). These are enough well-pled facts to push Plaintiff's section 1981 and 1982 claims over

the line from speculative to plausible. *See Sam Han v. University of Dayton*, 541 F. App'x. 622, 626 (6th Cir. 2013) (holding that a plaintiff "need not present detailed factual allegations," so long as he "allege[s] sufficient factual content" from which the reasonable inference of discrimination could be drawn (quotations omitted)). The circumstantial inference analysis involves many layered questions of fact that are inappropriate to dispense of at this procedural stage and cannot be answered as a matter of law. Therefore, Plaintiff's section 1981 and 1982 claims survive at this stage.

### iii.    42 U.S.C. § 1985

In order to state a plausible claim under section 1985, a plaintiff must allege that (1) the defendants conspired together; (2) for the purpose of depriving it of equal protection of the laws; (3) that the defendants committed an act in furtherance of the conspiracy; (4) which caused injury to person or property, or a deprivation of any right or privilege of a citizen of the United States; and (5) that the conspiracy was motivated by racial or other class-based discriminatory animus. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, (1971); *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999). Section 1985 claims cannot be premised upon mere conclusions and opinions—a plaintiff must allege sufficient facts to link two or more conspirators, and must establish a "meeting of the minds." *Goodykoontz*, 2024 WL 4519253, at *3 (citing *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)).

Defendants argue that Plaintiff's section 1985 claim necessarily fails because Plaintiff has not pled plausible section 1981 and 1982 claims. The Sixth Circuit has not weighed in on the question of whether a plausible section 1985 claim requires plausible allegations of predicate civil rights violations under Title 42. Defendants also fail to state any caselaw supporting that

19

proposition. ECF 10-1 at 13-14.[5] It is unnecessary for this Court to take up that issue today because, in any event, Plaintiff has plausibly pled its section 1981 and 1982 claims. *See supra* Section C (i).

Regardless, Plaintiff's section 1985 claim ultimately fails as a matter of law because it has pled unspecific and vague allegations that do not plausibly allege a Section 1985 conspiracy. Plaintiff alleges that all Defendants made coordinated noise complaints (¶¶ 31-35), interfered with pest control (¶ 59), sent a notice of non-renewal of the lease (¶¶ 67-72), filed the state court action (¶¶ 83-84), and threatened self-help eviction (¶ 104). ECF 1; ECF 12 at 14. Plaintiffs contend that "discovery may show" how various named Defendants and unnamed residential tenants furthered a discriminatory conspiracy. ECF 12 at 14 (emphasis added). These allegations are insufficient at the pleading stage. No actions taken by individual Defendants are mentioned, let alone are any actions plausibly connected to a common purpose of discrimination to deprive Plaintiff of equal protection of the law. Simply lumping multiple Defendants into a conspiracy claim without alleging how each Defendant acted in furtherance of the conspiracy—and hoping that this will be revealed in discovery—does not plausibly allege a section 1985 claim at the pleading stage. Therefore, Plaintiff's section 1985 conspiracy claim is dismissed without prejudice.

---

[5] Defendants cite *Goodykoontz*, 2024 WL 4519253, at \*3 and *Bass*, 167 F.3d at 1050. Neither case supports the proposition that a plaintiff must plead a separate plausible Title 42 violation in order to successfully plead a section 1985 conspiracy claim. In *Goodykoontz*, this Court determined that the plaintiff failed to state a plausible section 1985 claim on grounds completely independent from that same plaintiff's separate section 1981 and 1982 claims—in fact, the section 1985 claims were evaluated and dismissed in that case before the Court reached the separate analysis of the section 1981 and 1982 claims. *Goodykoontz*, 2024 WL 4519253, at \*3-4. And, in *Bass*, the plaintiff's section 1985 claim was rejected because he failed to allege or produce evidence that law enforcement defendants' use of excessive force was motivated by racial or class-based animus. *Bass*, 167 F.3d at 1050. That case involved separate section 1983 claims that the court actually remanded, while the section 1985 claim was separately affirmed as failed. *Id.* at 1048. Therefore, Defendants have not cited any on-point authority for their proposition that section 1985 requires a predicate Title 42 or other civil rights violation.

**D.  Alleged Violation of Federal Fair Housing Act & Ohio Civil Rights Act**

Because Plaintiff's claims for violations of the federal FHA and the Ohio FHA apply the same law, these claims will be considered together. *See Ohio C.R. Comm'n v. Wells Fargo Bank, N.A.*, No. 1:11-cv-623, 2012 WL 1288489, at *3 (N.D. Ohio Apr. 16, 2012) (holding that the Court may rely upon federal case law under the FHA to resolve a motion to dismiss related to claims under Ohio's FHA statute). Defendant argues that Plaintiff fails to state plausible FHA claims because: (1) Plaintiff does not have standing to sue under the FHA, which does not apply to commercial leases; and (2) Plaintiff has not properly pled racial steering. While Defendants are incorrect that Plaintiff does not have standing under the FHA simply because the FHA does not apply to commercial transactions, they are correct that Plaintiff is not an aggrieved person under the statute. And, Plaintiff has also not properly pled racial steering. Therefore, its FHA claims must be dismissed.

**i.     Plaintiff's Standing to Sue under the FHA and Ohio FHA**

FHA standing is broadly construed: a plaintiff is required to allege "injury in fact" within the meaning of Article III of the United States Constitution—that is, the injury must be concrete, particularized, and must share a causal connection to the defendant's actions. U.S. Const. Art. III, § 2, cl. 1; *Santulli v. Russello*, 519 F. App'x 706, 710 (2d Cir. 2013) ("[A] plaintiff must show a causal connection … between the protected activity and the adverse action as part of his *prima facie* case." (quotation omitted)). Thus, <u>anyone</u> who is "genuinely injured by conduct that violates <u>someone's</u> [] rights" under the FHA has standing to sue. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n.9 (1979) (emphasis in original) (emphasizing that "[t]he central issue at [the summary judgement] stage of the proceedings is not who possesses the legal rights" protected by the FHA, "but whether respondents were genuinely injured by conduct that violates

21

someone's

[FHA] rights, and thus are entitled to seek redress of that harm[].”). And, the Supreme Court has consistently held that the FHA's definition of an aggrieved person reflects Congress's intent to confer standing as broadly as possible. *See Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 197-98 (2017) (collecting cases); *see also Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 176 (2011) (“Later opinions, we must acknowledge**,** reiterate that the term 'aggrieved' … reaches as far as Article III permits[.]”). Thus, the appropriate question to ask regarding FHA standing is not what type of property the claimant occupies, but whether they are an aggrieved person under the statute.

Defendants cite caselaw to attempt to prove that the FHA is inapplicable to “commercial transactions.” ECF 10-1 at 15. But Defendants miss the point—based on well-established precedent, FHA standing is as broad as possible and includes those who would not reside at the property in question. This principle is reflected in the Court's continual expansion of FHA standing to government entities, testers [6], white residents, and non-profit organizations, to name a few. *See, e.g.*, *Gladstone*, 441 U.S. at 110-111; *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). An FHA claim can be brought by those persons beyond those who are directly and immediately subject to discrimination themselves. *See Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 544 (6th Cir. 2014). Thus, the appropriate question to focus on to determine Plaintiff's standing is whether it suffered concrete and particularized harm that is causally connected to the Defendants' conduct, thereby meeting the definition of an “aggrieved person.” *See Chapius v. Forest Hills Grp., LLC*, No. 2:24-cv-2525, 2025 WL 2382068, at *1-3 (W.D. Tenn. Aug. 15, 2025).

---

[6] “Testers” are those who pose as prospective tenants applying for leases in order to collect evidence of racial steering. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).

a.    Concrete & Particularized Harm: Racial Steering

To be concrete, an injury cannot be abstract—federal courts may use "history and tradition" as a guidepost for determining the types of cases that Article III empowers them to consider and whether the injury is abstract or concrete. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021). Put otherwise, "a concrete injury must be 'de facto' … it must actually exist." *Déjà Vu of Nashville, Inc. v. Metro. Govt. of Nashville*, 360 F.Supp.3d 714, 724 (M.D. Tenn. 2019). To be particularized, the injury asserted "must affect the plaintiff in a distinct way." *See id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). And the injury-in-fact must be "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury that the Plaintiff asserts in this case is Defendants' alleged racial steering. To plead racial steering, a plaintiff must allege that (1) a racial minority; (2) applied for and was qualified to rent or purchase certain property or housing; (3) was rejected; and (4) that the housing or rental property remained available thereafter. *Selden Apts. v. HUD*, 785 F.2d 152, 159 (6th Cir. 1986). To succeed on this claim, Plaintiff must allege that the racial steering (1) actually exists (i.e., is concrete) and (2) must affect Plaintiff in a distinct way (i.e., is particularized).

Defendants argue that Plaintiff's allegations are conclusory, and that because it bases its allegations "upon information and belief," they are insufficient to allege racial steering. ECF 13 at 15-16. Plaintiff argues that its allegations of racial steering actually exist and affected its restaurant in a distinct way. ECF 12 at 16. Such allegations include that Defendants sought to eliminate HOC because its Black clientele attracted Black residential tenants, and Defendants sought to market to preferred white tenants. ECF 1 at ¶¶ 1-2, 52, 74-75, 109; ECF 12 at 15-16. But these allegations are not enough to plausibly plead that racial steering actually exists or that it distinctly harmed Plaintiff. Although Plaintiff adequately pled that it was affected by the alleged racial steering

23

practices in a distinct way—by Defendant rejecting its tenancy when its lease ran its term—it has not sufficiently alleged that racial steering actually exists. Plaintiff has not pled any of the four elements required to show establish concrete racial steering: it has not shown that a racial minority applied to live in Defendants' adjoining residential property, was qualified, rejected, and that the property remained available. In this way, its allegations, which are heavily bolstered "upon information and belief," fall flat. And Plaintiff's attempt to salvage its claim by arguing that "discovery will reveal" the extent of racial steering and prejudicial motivations that Defendant exercised, ECF 12 at 15 n.6, does not save its claim—it has not pled any elements of the prima facie case, which is a pleading deficiency that supports a Rule 12(b)(6) dismissal. Because of this failure, Plaintiff has not pled that a concrete and particularized injury-in-fact exists. As such, the causality element, including proximate cause, is a seemingly moot point. But for the sake of argument, this element is considered below.

        b.      Causality

Plaintiff must plausibly allege that Defendant's alleged racial steering proximately caused its injury. *See Bank of Am. Corp.*, 581 U.S. at 201. To allege proximate causation, a plaintiff must allege that there was a direct connection between its injury and the defendant's conduct. *Id.* at 202-03.

Defendants argue that Plaintiff has made no such connection. Plaintiff alleges that Defendants "sought to eliminate" Plaintiff's restaurant because the restaurant attracted majority Black patrons, in turn attracting Black residential tenants to the property, and that this "undermined" Defendants alleged efforts to market the building to white tenants in a discriminatory way. ECF 1 at ¶¶ 1-2, 52, 74-75, 109; ECF 12 at 15-16. These allegations alone add in a "middle step" in the chain of causality, which makes proximate cause questionable;

Plaintiff alleges: "[h]ere, the discriminatory treatment of Plaintiff was undertaken for the purpose and with the effect of maintaining and/or restoring a pool of mostly-white residential applicants, an unlawful steering practice …." ECF 1 at ¶ 109. As Plaintiff alleges, Defendant's racial steering is not even the first link in the requisite causal chain—it is Plaintiff's own operation of HOC. As Defendant puts it, "…[Plaintiff] claims it was injured by <u>non-housing</u> discrimination <u>against it</u>— not by <u>housing</u> discrimination <u>against others</u>." ECF 10-1 at 17 (emphasis in original). This odd reversal is inconsistent with how precedent examines proximate causality, and Plaintiff fails to plead a plausible connection between Defendants' actions and its injury. It is ultimately unclear what theory Plaintiff is using to allege that it is an "aggrieved person" under the FHA. Therefore, under its current theory, Plaintiff has not plausibly pled its FHA claims. Accordingly, Plaintiff's federal and state FHA claims are dismissed without prejudice.

### E. Breach of Contract

Plaintiff pleads that Defendants breached the terms of the Lease in two ways: (1) breaching the covenant of quiet enjoyment in interfering with Plaintiff's patio music, and (2) breaching Section 5(a)(iv) of the Lease by ordering Plaintiff to use a preferred exterminator that came less than two times per month as required per the Lease. Although Defendant has not breached the covenant of quiet enjoyment as a matter of law, Plaintiff has plausibly pled that Defendant breached Section 5(a)(iv) of the lease in providing inadequate extermination services and accordingly breaching the implied duty of good faith and fair dealing.

### i. Covenant of Quiet Enjoyment

To constitute a breach of the implied covenant of quiet enjoyment under Ohio law, "… the interference with the tenant's quiet enjoyment must be so substantial as to be tantamount to an eviction, actual or constructive." *Telecom Acquisition Corp. I, Inc. v. Lucic Ents., Inc.*, 2016-Ohio-

25

1466, 62 N.E.3d 1034, at ¶ 15 (Ct. App.) (quotation omitted). Constructive eviction occurs when the landlord interferes with the tenant's enjoyment and possession of the premises in a way that compels the tenant to leave. *See id*. at ¶ 16.

Actual eviction is not at issue here, because Plaintiff has not alleged that it was actually evicted. Plaintiff also does not allege facts demonstrating that it was constructively evicted. Indeed, Plaintiff's admission that it sought to extend the lease term and engage in additional lease negotiations with Defendant negates any claim that Plaintiff was compelled to leave the property. ECF 1 at ¶¶ 70-79. Therefore, Plaintiff's breach of contract claim cannot rest on a breach of the covenant of quiet enjoyment because it fails as a matter of law. It is dismissed with prejudice.

### ii.    Extermination Services

Plaintiff alleges that Defendants' insistence that it terminate its third-party extermination contract and replace its services with Defendants' preferred vendor constitutes a breach of the Lease. Defendants argue that the plain meaning of the word "maintenance" emcompasses pest control, and cites to a discretionary condition contained in Section 16 of the Lease, which states, in pertinent part:

> If, after notice from Landlord, Tenant fails or refuses to make any repairs or provide any maintenance required of Tenant under this Lease, then Landlord may, but shall not be obligated to, make or cause the repairs to be made or maintenance to be provided, and Tenant shall pay the full cost to Landlord upon demand as additional rent.

ECF 10-2 at 19.

Plaintiff argues that Section 5(a)(iv) of the Lease specifically gives Plaintiff the right to use its own exterminator. ECF 12 at 17. That Section reads, in pertinent part: "Tenant, at its expense, shall … [p]rovide exterminating service for the Demised Premises at least two (2) times per month." ECF 10-2 at 5.

An important note is that although this provision directly mentions exterminating services, it does not confer any "rights" to Plaintiff under the Lease to choose its own exterminator —it merely obligates them to service the premises. But the same could be said of Defendant's discretionary condition: nothing in Section 16 of the Lease confers upon Defendant the <u>exclusive</u> right to choose which extermination service Plaintiff uses. *Id*. at 19. Plaintiff also alleges that Defendant's preferred exterminator actually serviced HOC <u>less than twice per month</u>, and upon Plaintiff's request to increase service quality and frequency, Defendant never responded. ECF 1 at ¶¶ 122-124. It is curious that Defendant would replace Plaintiff's allegedly more frequent exterminator with one who allegedly failed to provide consistent and effective services, and then would blatantly ignore Plaintiff's requests for improved service. Substituting a lesser alternative for Plaintiff's choice of exterminator seems to defeat the purpose of the discretionary clause altogether, and tends to point to an arbitrary and opportunistic exercise of discretion on Defendant's part.

Ohio law recognizes the implied duty of good faith and fair dealing in all contracts. *Lucarell v. Nationwide Mutual Ins. Co.*, 2018-Ohio-15, 97 N.E.3d 458, at ¶ 42 (2018). Good faith is "a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Bell's Landscaping & Lawn Servs., LLC v. Owens Corning Sales, LLC*, 2025-Ohio-5602, 275 N.E.3d 702, at ¶ 36 (Ct. App.) (quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 1996-Ohio-194, 662 N.E.2d 1074, 1083 (1996)). "[W]hen disputed, good faith efforts to satisfy contractual conditions are factual issues." *Butler Cnty. Bd. of Commrs. v. Hamilton*, 763 N.E.2d 618, 636 (Ohio Ct. App. 2001) (quotation omitted). But a party does not breach the implied duty of good faith and fair dealing merely by seeking to enforce the contract or acting as permitted

by its express terms. *See Lucarell*, 2018-Ohio-15, 97 N.E.3d at ¶ 43. Additionally, a plaintiff must plead that the defendant breached an express term of the contract, "such as one that permits a party to exercise discretion in performing a contractual duty," in order to show a breach of the implied duty of good faith. *Id.* at ¶¶ 43-44 (explaining that there is no independent cause of action for breach of the implied duty of good faith and fair dealing without a breach of the underlying contract).

Plaintiff has pled a breach of the express terms of the Lease, so the duty of good faith is not impermissibly untethered to an underlying breach. ECF 1 at ¶ 119. And whether or not Defendants breached the implied duty of good faith and fair dealing by breaching either Section 16 or Section 5(a)(iv) of the Lease involves many disputed questions of material fact surrounding good faith efforts. These questions include, but are not limited to: whether Defendants' intent in exercising the condition was legitimate or arbitrary; whether Defendants' exercise of discretion was permitted under the contract; whether Plaintiff's preferred exterminator was, in fact, better than Defendants' (and vice versa); and whether Plaintiff's extermination services constituted a "failure" or "refusal" to maintain the premises within the meaning of Section 16 of the Lease. These questions are not appropriately resolved as a matter of law, and therefore survive a Rule 12(b)(6) motion to dismiss. *See Butler Cty. Bd. of Commrs.*, 763 N.E.2d at 636. Plaintiff has therefore plausibly pled a breach of contract claim.

### F. Tortious Interference with Business Relationships

Finally, Plaintiff alleges Defendants tortiously interfered with its business relationships. "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Barilla*

*v. Patella*, 760 N.E.2d 898, 904 (Ohio Ct. App. 2001) (quotation omitted). A defendant's conduct is only tortious if it had no privilege to engage in the complained-of activity. *Id.* Further, the plaintiff must identify specific business relationships that the defendant(s) improperly interfered with. *See Barrio Bros., LLC v. Revolucion, LLC*, No. 18-cv-2052, 2020 WL 3547014, at *7 (N.D. Ohio Jun. 30, 2020) ("A vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim." (citing *Wilkey v. Hull*, 366 F. App'x 634, 638 (6th Cir. 2010))); see also *Wilkey*, 366 F. App'x at 638 (affirming dismissal of tortious interference with business relations claims where "[plaintiff] merely states that [defendant] 'interfered' with certain unspecified business relationship" because such "vague assertion of interference … is just a 'legal conclusion' that is itself entitled to no weight" (citation omitted)).

Here, Plaintiff fails to articulate a specific business relationship that Defendant interfered with, and instead proffers general and vague allegations that do not suffice to state a claim. Without specific relationships named in the complaint, it is impossible to prove that Defendants intentionally caused injury to such relationships. Plaintiff merely alleges that it had "ongoing business relationships with HOC customers," that Defendants were aware of its customer relationships, and that Defendants interfered with such relationships by interrupting live music and ordering it to use its preferred exterminator. ECF 1 at ¶¶ 126-128. While live music interruptions and a failure to address pest issues can certainly drive away restaurant customers, Plaintiff fails to sufficiently allege that Defendant intentionally caused this result in order to interfere with its business relationships. Plaintiff therefore falters on its pleading requirements.

Plaintiff argues that *Wagner v. Circle W. Mastiffs*, where the Southern District of Ohio held that a Plaintiff need not name specific customers to meet pleadings requirements, shows that Plaintiff is not required to identify specific HOC customers at the pleading stage. ECF 12 at 18-19

29

(discussing *Wagner v. Circle W. Mastiffs,* 732 F.Supp.2d 792, 807-08 (S.D. Ohio 2010)). But this case runs contrary to Sixth Circuit authority, which requires specificity. *See Wilkey v. Hull*, 366 F. App'x. 634, 638 (6th Cir. 2010); *Shepard & Associates, Inc. v. Lorking Tech., LLC*, No. 1:20-cv-2488, 2022 WL 2398392, at *7 (N.D. Ohio July 1, 2022); *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F.Supp.3d 552, 559 (N.D. Ohio 2021); *Richardson v. CVS Caremark Corp.*, No. 1:18-cv-1308, 2018 WL 4189522, at *3 (N.D. Ohio Aug. 31, 2018). This Court has recently reaffirmed the specificity requirement in *Alves v. Internet Truckstop Payments*, dismissing a claim where the plaintiff failed to specifically allege the business relationships with which the defendants allegedly tortiously interfered. *See Alves v. Internet Truckstop Payments, LLC*, No. 1:26-cv-0150, 2026 WL 1481334, at *9 (N.D. Ohio May 27, 2026). Plaintiff's tortious interference claim is therefore dismissed without prejudice.

## IV. CONCLUSION

For these reasons, this Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss. All claims against Defendant The K&D Group, Inc. are **DISMISSED WITH PREJUDICE**. All claims against Defendant Douglas E. Price, III are **DISMISSED WITHOUT PREJUDICE**. As to all remaining Defendants, the claim for breach of contract based on a breach of the implied covenant of quiet enjoyment is **DISMISSED WITH PREJUDICE**. As to all remaining Defendants, the claims for: (1) conspiracy to violate civil rights based on racial animus under 42 U.S.C. § 1985; (2) violations of the federal Fair Housing Act; (3) violations of the Ohio Fair Housing Act; (4) and tortious interference with business relationships are **DISMISSED WITHOUT PREJUDICE**. The Motion to Dismiss as to all other claims is **DENIED**.

**IT IS SO ORDERED**

Dated: July 10, 2026

*/s/ Dan Aaron Polster*
**Dan Aaron Polster**
**United States District Judge**